FILED
2013 Jun-05  PM 04:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| **MARY NELSON and**<br>**OTIS NELSON,** | ) <br> ) <br> ) |
| **Plaintiffs,** | ) <br> ) |
| **v.** | ) <br> ) <br> )   **CIVIL ACTION NO.:** <br> )     **CV-2012-CO-1965-W** |
| **NATIONWIDE PROPERTY &**<br>**CASUALTY INSURANCE**<br>**COMPANY, et al.** | ) <br> ) <br> ) <br> ) |
| **Defendants.** | ) |

### OPPOSITION TO PLAINTIFFS' RULE 37 MOTION TO COMPEL

COMES NOW Defendant Nationwide Property & Casualty Insurance Company (hereinafter "Nationwide"), by and through its counsel of record, and, pursuant to Rule 26(c), Fed. R. Civ. P., moves this Court to deny Plaintiff's Motion to Compel as it is premature and without any valid basis.  In support thereof, Nationwide states as follows:

### SUMMARY AND CLARIFICATION OF FACTS

On May 24, 2012 the plaintiffs, Mary Nelson and Otis Nelson, filed a Summons and Complaint in the United States District Court for the Northern District of Alabama, Western Division, against J. Drew Mayfield, Nationwide Property & Casualty Insurance Company, GBS Roofing & Restoration, LLC, Brian Kennedy and George Smith.

The factual allegations of the Complaint are that on April 27, 2011 the Nelsons' home was severely damaged by a tornado and that they had a homeowners policy of insurance with Nationwide bearing Policy No. 77 01 HP 083430. It is further alleged that on May 6, 2011 Nationwide sent Mayfield to assess the damage to the home and adjust the loss. It is claimed that Mayfield was accompanied by a structural engineer who determined that even though the home was not inhabitable that it could be repaired and was not a total loss. It is further claimed that on May 8, 2011 Mayfield met with the Nelsons and that Mayfield was accompanied by Smith and a woman named "Bridget" who represented herself as an employee of Smith. Mayfield allegedly introduced Smith as being a contractor who owned a construction company named GBS Roofing & Restoration and purportedly told the Nelsons that Smith and GBS had worked with him on several losses in Florida. It is claimed that Mayfield affirmatively represented to the Nelsons with the intent that the Nelsons would rely upon his representations that "GBS is a good company; GBS would do the work for the Nelsons for the adjusted value; and, GBS would do a very good job." Smith and Bridget purportedly assured the Nelsons that "they would take care of everything and that they should not worry."

Allegedly, based upon the representations, Mr. Nelson signed a contract with GBS on May 12, 2011 for the work as shown by the estimate prepared by Mayfield. The payment terms were "50% deposit at the beginning of the work, 30% when the work was half completed or as determined by the project foreman, and 20% upon completion." Mayfield is claimed to have completed the estimate on May 18, 2011 and on May 20, 2011 forwarded a check to the Nelsons in the amount of $79,426.60. It is claimed that "even though the policy stated that payments would only be made to the Nelsons as the insureds and to their mortgagee (which Nationwide knew to be Household Financial Corporation), Mayfield also included GBS as a payee on the

draft." It is next claimed that Mayfield and Smith told the Nelsons that the Nelsons should simply endorse the check and hand it over to Smith, who would then obtain the endorsement of the mortgagee. It is claimed that Smith and Kennedy failed to get the mortgagee's signature on the check and instead took the funds for their own use.

It is claimed that GBS placed the belongings of the Nelsons into a rented storage pod and began pushing trees from the property without removing the trees. It is claimed that throughout the summer of 2011 that GBS performed sporadic work on the house and in late summer, early fall of 2011 the Nelsons were notified that a subcontractor of GBS was filing a lien on their home for non-payment. Mr. Nelson reportedly confronted Kennedy of GBS with this information and Kennedy acknowledged that "George took the money" (meaning the Nationwide check) and that GBS could not pay its subcontractors. Kennedy reportedly assured Nelson that GBS would pay the subcontractor and perform the work as money became available. Although GBS eventually paid the funds to have the lien removed, it failed to complete the repair work on the home according to what is alleged in the Complaint.

The following counts are alleged against Nationwide: Count Four is a breach of contract of insurance against Nationwide. It is claimed that Nationwide breached its contract "by paying for the repairs at issue by writing a check jointly to GBS as well as the Nelsons and their mortgage company, in violation of the terms of the insurance contract; by encouraging the Nelsons by and through Mayfield to endorse the check and turn it over to GBS, a party having no property rights in the covered property and a party that "ultimately diverted the payment to its own use;" Count Five is a claim of negligent and wanton performance of an insurance contract against Nationwide. This count asserts that Nationwide had a duty to perform the contractual undertaking of indemnification for property loss, including indemnification by repair or

replacement of the covered property and which duty it is claimed Nationwide breached by and through its agents, including Mayfield who "negligently or wantonly paid for the repairs at issue by writing a check jointly to GBS, the Nelsons and their mortgage company and negligently or wantonly encouraging the Nelsons to endorse the check and turn it over to GBS." It is further claimed that Nationwide "acted in reckless disregard or indifference to the likelihood of injury to the Nelsons by encouraging the Nelsons to endorse the check for the repairs and turning it over to GBS;" Count Six is for negligent and wanton performance of contract of repair against Nationwide.

Count Seven alleges fraud against Nationwide and Mayfield and claims that by virtue of the special circumstances of the case, a special or confidential relationship existed between the Nelsons and Nationwide and Mayfield, whom it is asserted Nationwide held out represented as being a specialist in handling large catastrophic losses. It is claimed that Mayfield was under a duty to disclose to the Nelsons the risk of theft and "appropriation" by placing GBS on the check.

Notwithstanding these assertions, the Plaintiffs testified that even after Drew Mayfield provided information in regards to his request for information on GBS (Depo. Excerpts of Otis Nelson, pp. 65-66, attached hereto as Exhibit "1"), he did his own independent search for another contractor, but was unable to locate one that could do the job. (Depo. Excerpts of Otis Nelson, p. 68, attached hereto as Exhibit "1": Q. Did you do any independent investigation to determine if they were a good contractor? A. We tried to check – we checked around to see if we could get a contractor in Tuscaloosa and we couldn't. There were no contractors available.) Mr. Nelson also admitted that he knew that he was hiring the contractor, not Nationwide. (Depo. Excerpts of Otis Nelson, p. 92, attached hereto as Exhibit "1") Significantly, Mr. Nelson testified that he has

no evidence that what Drew Mayfield told him was not true, other than he had problems with the contractor. (Depo. Excerpts of Otis Nelson, p. 101, attached hereto as Exhibit "1")  In fact, Mr. Nelson testified  that just because someone recommends a contractor, such as alleged Mr. Mayfield did, does not mean that the contractor will do a good job.  (Depo. Excerpts of Otis Nelson, p. 102, attached hereto as Exhibit "1")

As to the check, Mr. Nelson sated that he could have asked that the check be issued without GBS on it but chose not to. (Depo. Excerpts of Otis Nelson, p. 86, 89, attached hereto as Exhibit "1")  Mr. Nelson never raised any issues with Nationwide over how the check was issued. Id.

## RESPONSE TO DISCOVERY SOUGHT

**I.     The Complete Employment File of Drew Mayfield.**

Nationwide objected to this request on the grounds that the information sought is irrelevant and immaterial to the issues raised in this lawsuit and is not reasonably calculated to lead to the discovery of relevant, material and/or admissible evidence. Nationwide further objected to this request to the extent that it sought documents and/or information that are confidential and/or proprietary. Nationwide also objected to this request on the grounds that they were overly broad, vague, ambiguous, and unduly burdensome. Notwithstanding this objection, and subject to the in place confidentiality agreement, Nationwide produced the performance evaluation forms and resignation letter of Mr. Mayfield. The only

documents withheld related to financial information on Mr. Mayfield and information regarding his FMLA claim.

As such, Nationwide does not see the relevance or the necessity of this unduly-broad request. *See* Coker v. Duke & Co., Inc., 177 F.R.D. 682, 685 (M.D. Ala. 1998) (There is a strong public policy against the disclosing of personnel files.). In Duke, the plaintiff sought production of the personnel files of employees and agents of Duke who communicated with plaintiff. The court set forth that the discovery of such files is permissible only when plaintiff proves that "(1) the material sought is relevant and (2) the need for discovery is compelling because the information sought is not otherwise readily available." Id. at 685. Plaintiffs have provided no evidence that the *entire file* of J. Drew Mayfield is relevant to the issues at hand or that there is a compelling need for the entirety of his employee/employment file. As such, this request must be denied. Federal Rules of Civil Procedure, Rule 26(c) gives the trial court discretion to preclude discovery in civil actions when justice requires that certain matters not be inquired into, or that the scope of the discovery or discovery be limited to certain matters, in order to protect a party or person from annoyance, embarrassment, oppression, and undue burden or expense. *See* Fed. R. Civ. P. 26(c). The Court may limit discovery of relevant material if it determines that:

> "burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amounts in

controversy, the parties resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues."

Fed. R. Civ. P., 26(b)(2)(iii).   Courts have the duty to pare down over-broad discovery requests under Rule 26(b)(2), which provides that information may sometimes be withheld, even if relevant.   The Court should consider the totality of the circumstances, weighing the value of material sought against the burden of providing it, discounted by society's interest in furthering the truth seeking function. Rowlin v. Ala. Dept. of Public Safety, 200 F.R.D. 459, 461 (M.D. Ala. 2001) (citing Sanchez v. City of Santa Ana, 936 F.2d. 1027, 1033-34 (9th Cir. 1990) (denying § 1983 plaintiff access to personnel file of government employees because information relevant to employment case could have been obtained through interrogatories)); Aramburu v. Boeing Co., 885 F. Supp. 1434, 1444 (D. Kan. 1995) (Same for plaintiff-employee's request to examine 170 personnel files).[1]

Furthermore, Plaintiffs are not entitled to certain protected documents within the employee/employment file, including any FMLA documents and salary information, which are confidential and/or proprietary. Ex parte Thomas, 628 So. 2d 483, 485 (Ala. 1993) (Plaintiffs are not entitled to certain protected documents

---

[1] It should be noted, that one unfortunate consequence of our liberal discovery rules is that lawyers often attempt to bury opposing counsel in paperwork by requesting material that they do not really want and do not really need. Rowlin v. Ala. Dept. of Public Safety, 200 F.R.D. 459 (M.D. Ala. 2001).

within the employee/employment file, which are confidential and/or proprietary). Plaintiffs have failed to provide any citation of either statutory or case law to support their demands. For these reasons, this request is due to be denied to the extent specified by Nationwide in its objections.

## II.  All Documents Regarding an Investigation Performed by Nationwide Into Drew Mayfield and GBS Roofing's Relationship and Dealings.

Nationwide objected to this request on the grounds that it sought information that is irrelevant and immaterial to the issues raised in this lawsuit and is not reasonably calculated to lead to the discovery of relevant, material and/or admissible evidence. Nationwide further objected to this request to the extent that it sought documents and/or information that are confidential and/or proprietary. Nationwide also objected to this request to the extent it sought to invade the attorney client privilege and/or work product privilege.

Alabama law has consistently held that documents or materials that are prepared in anticipation of litigation are deemed work product and therefore not discoverable. *See* Ala. R. Civ. P. 26(b)(3), Committee Comments; C. Gamble, McElroy's Alabama Evidence §290.12(15), p. 1429 (5th ed. 1996); Ex parte State Farm Mut. Auto. Ins. Co., 386 So. 2d 1133 (Ala. 1980). In formulating the work product doctrine, the Alabama Supreme Court relied extensively upon United States Supreme Court precedent holding that the work product privilege extends to

a party's interviews, memoranda and statements procured "with an eye towards litigation":

> "'Proper preparation of a client's case demands that he [the lawyer] assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. The work is reflected, of course in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways[.] Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of clients and the cause of justice would be poorly served.'"

Id. at 1360-61 (quoting Hickman v. Taylor, 329 U.S. 495, 509-11, 67 S. Ct. 385, 392-94, 91 L.Ed. 451, 461-62 (1947) and Ex parte State Farm Mut. Auto. Ins. Co., 386 So. 2d 1133 (Ala. 1980) (other citations omitted)). See also C. Gamble, McElroy's Alabama Evidence §290.12(15), p. 1429 and n. 2 (5th ed. 1996); Ala. R. Civ. P. 26(b)(3), Committee Comments (describing Ala. R. Civ. P. 26(b)(3) as an accurate codification of Hickman v. Taylor, supra). The policy behind this doctrine has been held to apply to materials, interviews, and investigative efforts by a party or its insurer in anticipation of litigation. See Ex parte May, 393 So. 2d 1006 (Ala. 1981); Ex parte State Farm Mut. Auto. Ins. Co., 386 So. 2d 1133 (Ala. 1980).

Furthermore, Plaintiffs are not entitled to certain protected documents referenced in this request, as they are confidential and/or proprietary.

For these reasons, this request is due to be denied.

## III.   Document Nos. 0001-0035 Withheld by Nationwide.

This is a breach of contract claim, no bad faith claim has been asserted. Moreover, the Plaintiffs only regarding breach of contract is that Nationwide should not have issued the check as it did. Therefore, Nationwide's claims log notes are irrelevant and immaterial to this issue.  The check was issued in May 2011, the Plaintiffs attempt to ascertain notes that were created over a year after this payment.

As to the payment made by Nationwide on the claim, Mr. Nelson testified that "he has no evidence that the estimate prepared by Nationwide is not correct." (Depo. Excerpts of Otis Nelson, p. 104, attached hereto as Exhibit "1".

Nationwide objected to this request to the extent that it sought documents and/or information that are confidential and/or proprietary, constituted attorney client privilege and/or work product and to the extent that it sought documents generated post-suit.  Nationwide also objects to this request on the grounds that the documents are immaterial and irrelevant.  Nationwide did not produce its log notes after it had been alerted that an attorney had been retained, internal communication

was subject to the attorney-client privilege and work product privilege.  Moreover, a number of these entries were made with an attorney.

Alabama law is clear that any information Nationwide documented in its claims file is protected by the work product privilege.  Alabama law has consistently held that documents or materials that are prepared in anticipation of litigation are deemed work product and therefore not discoverable.  *See* Ala. R. Civ. P. 26(b)(3), Committee Comments; C. Gamble, McElroy's Alabama Evidence §290.12(15), p. 1429 (5th ed. 1996); Ex parte State Farm Mut. Auto. Ins. Co., 386 So. 2d 1133 (Ala. 1980).  Furthermore, Plaintiffs are not entitled to certain protected documents, which are confidential and/or proprietary.  *See, e.g.,* Ex parte Henry, 770 So.2d at 80.

Plaintiffs' motion must be denied as to this request.

**IV.   The Last Known Address and Phone Number of Drew Mayfield.**

Subject to and notwithstanding the objections asserted, Nationwide is willing to provide any last-known address of Drew Mayfield, as well as Rule 26 disclosures to the extent that such may be found.

**V.   The Names and Addresses of Nationwide Policyholders in North Carolina and Alabama for Whom Drew Mayfield Adjusted Claims in 2011.**

Plaintiffs' requests, as phrased, asks for each and every claim Drew Mayfield adjusted on behalf of Nationwide in the State of Alabama after April 27,

2011 and in the State of North Carolina after February 2011 without specification of the type of claim, who the insurance carrier was, etc.. The policy in this case is a homeowners policy, not a commercial policy; therefore, the request was not limited in scope, i.e. the same type of policy issued to Plaintiffs. *See* Fed. R. Civ. P. 26(c) (Information sought through discovery must be limited to a reasonable geographical area, a reasonable time period, and a reasonable scope of inquiry). *See also* <u>BMW of North America, Inc. v. Gore</u>, 51 U.S. 559 (1996) (Information from other jurisdictions as to wrongful acts is not admissible). Courts have the duty to pare down over-broad discovery requests under Rule 26(b)(2), which provides that information may sometimes be withheld, even if relevant. The Court should consider the totality of the circumstances, weighing the value of material sought against the burden of providing it, discounted by society's interest in furthering the truth seeking function. <u>Rowlin v. Ala. Dept. of Public Safety</u>, 200 F.R.D. 459, 461 (M.D. Ala. 2001). *See also* <u>Ex parte Horton</u>, 711 So. 2d 979 (Ala. 1998) (holding that even in a fraud case, the discovery must be closely tailored to the nature of the fraud alleged). Plaintiffs have not tailored their requests at all, but merely have demanded a list of all claims handle by Mr. Mayfield. Plaintiffs have cited absolutely no legal authority in support of their assertions of entitlement for these documents. *See, e.g.*, <u>Ex parte Henry</u>, 770 So. 2d 76 (Ala. 2000) (An insurance company's policyholder lists are confidential proprietary information to

which a litigant has no right except through court-ordered discovery.) For these reasons, this request must be denied.

## VI.   Complete Email Communications Between Jennifer Allen and Drew Mayfield.

This request is due to be deemed moot, as these items have already been produced.

## VII.   Un-redacted Copies of Documents Numbers 46, 48-51, 75, 102, 105, 109, 115-121, 125-127, 130-132, 134-135, 137-141, 144, 150.

Plaintiffs' request seeks irrelevant and immaterial information, which is not admissible or subject to discovery. To be relevant, information must relate to the subject matter of the action and have a reasonable possibility that it will lead to other evidence that will be admissible. Sanders v. Ala. State Bar, 161 F.R.D. 470, 472 (M.D. Ala., 1995); see, e.g., Ex parte Henry, 770 So. 2d 76 (Ala. 2000) (An insurance company's policyholder lists are confidential proprietary information to which a litigant has no right except through court-ordered discovery). Information relating to insurer's setting of reserves has been held to be irrelevant and not subject to disclosure. See Fidelity and Deposit Co. of Maryland v. McCulloch, 168 F.R.D. 516 (E.D. Pa. 1996) (Information related to insurer's setting of reserves upon notice of potential loss under policies was not relevant, and was not subject to disclosure in insurance coverage dispute in which defendant asserted bad faith counterclaim). See also National Union Fire Ins. Co. of Pittsburgh, Pa. v. Stauffer

Chemical Co., 558 A.2d 1091 (Del. Super. 1989) (Insurers that were required to produce claim and underwriting files pertaining to coverage to determine scope of liability policies were entitled to redact files to extent deemed necessary to preclude release of confidential information).

Rule 26(c) recognizes that the right of discovery is not unlimited. The court is given broad power to control the use of the process and to prevent its abuse by any party; however, the rule does not allow an arbitrary limit on discovery, but instead vests the trial court with discretion in the discovery process. Campbell v. Regal Typewriter Co., 341 So. 2d 120 (Ala. 1976). Moreover, the trial court's role is to exercise its broad discretion in a manner that will allow full disclosure of relevant information and at the same time afford a party maximum protection against unnecessary disclosure. Ex parte Guerdon Industries, Inc., 373 So. 2d 322 (Ala.1979). Because the redacted documents relate to the setting of reserves by Nationwide, and the issue of reserves is clearly not relevant, as stated by Alabama and Federal courts, Plaintiffs' request for such is due to be denied.

## CONCLUSION

For these reasons, Plaintiffs are not entitled to discovery responses beyond the extent specified in Nationwide's objections. Plaintiffs have failed to closely tailor their discovery requests to their claims; accordingly, the discovery requests are due to be denied. With respect to any specific material requested in the instant

case, Plaintiff has failed to show why Nationwide should be compelled to disclose information in the extremely broad categories of these claims. Plaintiffs are not entitled to discovery responses where their overly broad requests are oppressive and burdensome or where the requests seek documents that are confidential and/or proprietary. Because Plaintiffs have failed to provide any plausible reason why the information requested is relevant and discoverable and because Plaintiffs have failed to cite to any legal authority for its "entitlement," the discovery requests are due to be denied in accordance with the objections set forth by Nationwide.

WHEREFORE, PREMISES CONSIDERED, Nationwide Property and Casualty Insurance Company respectfully requests this Court to enter an Order denying Plaintiffs' Motion to Pursuant to Rule 37 Compelling Discovery and requests this Court to enter an Order that discovery not be had.

Respectfully submitted,

/s/ Kori L. Clement
Kori L. Clement (CLEK5125)
Attorney for Defendant
Nationwide Property and
Casualty Company

OF COUNSEL:
HARE & DUCK, P.C.
100 Chase Park South, Suite 200
Hoover, Alabama 35244
Telephone: (205) 322-3040
Facsimile:  (205) 403-4975
Email: clem@harelaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this the 5th day of June, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

W. Ivey Gilmore, Jr., Esquire
Gilmore, Poole & Rowley,
 Attorneys At Law, LLC
1905 7th Street
Tuscaloosa, Alabama  35401

Joe L. Leak, Esquire
Joe L. Leak & Associates, P.C.
3800 Colonnade Parkway, Suite 330
Birmingham, Alabama  35243

Frank Cauthen, Jr., Esquire
Frank M. Cauthen, Jr., P.C.
601 Greensboro Avenue
Alston Place, Suite 1-A
Tuscaloosa, Alabama  35401

I hereby certify that a copy of the above and foregoing document has been served upon counsel of record by placing a copy of same in the United States Mail, properly addressed and postage affixed, this the 5th day of June, 2013, as follows:

GBS Roofing and Restoration, LLC
5389 Highway 115 West
Cleveland, Georgia  30528

Brian Kennedy
5389 Highway 115 West
Cleveland, Georgia  30528

George Smith
5389 Highway 115 West
Cleveland, Georgia  30528

/s/ Kori L. Clement
Of Counsel

EXHIBIT "1"

OTIS NELSON

1

```
 1        IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF ALABAMA

 3                 WESTERN DIVISION

 4

 5

 6    MARY NELSON and OTIS NELSON,

 7     Plaintiffs,

 8

 9            vs.              CIVIL ACTION NO:

10                            CV-2012-CO-1965-W

11

12    NATIONWIDE PROPERTY &

13    CASUALTY INSURANCE COMPANY, et al.,

14     Defendants.

15

16

17          DEPOSITION OF OTIS NELSON

18

19       The deposition of OTIS NELSON, was taken

20    before Amber R. Newton, CCR, on Monday, May

21    13, 2013, at Gilmore, Poole & Rowley, 1905 7th

22    Street, Tuscaloosa, Alabama, commencing at

23    9:05 a.m., pursuant to the stipulations set

24    forth herein:

25
```

OTIS NELSON

65

1     check then.

2          Q.     Okay.  So on May the 20th you

3     didn't get a check?

4          A.     On May the 20th is when the

5     check was turned over to GBS.

6               MR. LEAK:  She's just talking

7     about the 12th meeting.

8          A.     On the 12th --

9          Q.     (By Ms. Clement)  I'm on the 12th.

10              MR. GILMORE:  She wants to know

11    everything that Mayfield told you on the 12th.

12         A.     Mayfield -- on what Mayfield

13    told me on the 12th?

14         Q.     (By Ms. Clement) Correct.

15         A.     In order -- before I signed the

16    contract with George Smith and GBS, Mayfield

17    assured me they were a legitimate company,

18    they would do me a good job, they would look

19    out for my -- my wife's interest, and he

20    recommended them highly.

21         Q.     Okay.

22         A.     They had done work for him

23    before and it was very satisfactory.

24         Q.     Had you asked him what he thought

25    of GBS since GBS was out there?

OTIS NELSON

66

1      A.     Yes, I -- first I asked him,

2   well, how did you -- how did you meet them to

3   start with?

4      Q.     Sure.  So you were trying to find

5   out information --

6      A.     Yeah.

7      Q.     -- about GBS?

8      A.     Sure.  He says, I met them in

9   Florida when I was down there handling claims

10  and recently.

11     Q.     Okay.

12     A.     And they -- he said, they did a

13  good job for me down there and they expressed

14  interest to come and follow me and do some

15  more work on claims that I had up here.

16     Q.     Okay.  Let me ask you this:  Were

17  you trying to get information about GBS to

18  decide if you wanted to hire them or not?

19     A.     Yes.

20     Q.     Okay.  Did you ask for any

21  references from George Smith?

22     A.     No, I did not.

23     Q.     Okay.  Did you go and ask anyone

24  about GBS or whether you should hire GBS?

25     A.     Other than George Mayfield --

OTIS NELSON

68

1   say he I --

2        Q.      (By Ms. Clement) He told you they

3   had done work?

4        A.      Drew Mayfield told me that he

5   highly recommended them, and that's -- yeah,

6   we went with that.

7        Q.      Okay.  Did you do any independent

8   investigation to determine if they were a good

9   contractor?

10       A.      We tried to check -- we checked

11  around to see if we could get a contractor in

12  Tuscaloosa and we couldn't.  There were no

13  contractors available.

14       Q.      Is it fair to say that you decided

15  to go with GBS because you couldn't find

16  another local contractor?

17       A.      No.  We decided to go with GBS

18  because we trusted our claims agent.

19       Q.      Well, let me ask you this, Mr.

20  Nelson:  You did call around trying to find

21  out if there was a contractor local that could

22  do the job, didn't you?

23       A.      I did some checking, yes.

24       Q.      Okay.  Who did you call?

25       A.      I'm not even sure I remember.

OTIS NELSON

1        A.       No.

2        Q.       -- on May 20th?

3        A.       On the 20th he -- he -- he

4    presented a check for us to endorse, yes.

5        Q.       Okay.

6        A.       And we endorsed it.

7        Q.       All right.  Now, you could have

8    asked for the check to be made out only to

9    you, correct?

10              MR. GILMORE:  Object to form.

11       A.       The check was made out already.

12       Q.       (By Ms. Clement) I'm asking you:

13   Did you ask for the check to be made out any

14   other way?

15       A.       No, I didn't.

16       Q.       Okay.  And there was nothing

17   preventing you from asking for the check to be

18   made out different, was there?

19       A.       No, not really.

20       Q.       Okay.  And you knew based on your

21   contract with GBS, which is document Number 1,

22   that had been in your possession since May

23   12th that you only owed 50 percent deposit for

24   the amount of the repairs, correct?

25       A.       Right.

1      Q.      (By Ms. Clement) Let me show you

2   what I've marked as Number 2 because I'm not

3   trying to mislead you.  You take a look at

4   that for me.

5      A.      Yes, that's the check.

6      Q.      Okay.

7      A.      That's the big check that he had

8   with him.

9      Q.      All right.  And is that yours and

10   your wife's signature?

11      A.      Yes, ma'am, that is.

12      Q.      Okay.  And when you got that check

13   did you ask Nationwide to reissue the check

14   without GBS on it?

15      A.      No, I did not.

16      Q.      Did you ever raise any displeasure

17   with Nationwide as to how the check was

18   written on May 20th?

19      A.      No, because I trusted

20   Nationwide.  I trusted Drew Mayfield.

21      Q.      I'm just asking yes or no.

22      A.      I'm -- well, I'm --

23      Q.      Okay.  So you signed the check

24   over and gave it to --

25      A.      George Smith.

1   possession; is that fair?

2       A.    Right.

3       Q.    Okay.  And if you'll look on the

4   first page, right, the letter says that if you

5   choose to hire a contractor that you are to

6   provide them with an estimate, correct?

7       A.    Correct.

8       Q.    All right.  So you would agree

9   with me this letter was telling you it was you

10  who would be hiring a contractor not

11  Nationwide?

12              MR. GILMORE:  Object to the form.

13      Q.    (By Ms. Clement) You can answer?

14      A.    You want me to answer?

15      Q.    Yes.

16      A.    Okay.  Yes, I understood that.

17      Q.    Okay.  Now, did you also get an

18  estimate that day?

19      A.    Yes.

20      Q.    Okay.

21      A.    The estimate was given on the

22  same day.

23              (Whereupon, Defendant's Exhibit

24  Number 4 was marked for identification.)

25      Q.    All right.  Let me show you what

1    have any information saying that they did

2    good work or did not do good work.

3          Q.      And as you sit here today, you

4    have no evidence that they did bad work prior

5    to the April 27, 2011 tornado?

6          A.      No, I do not.

7          Q.      Okay.  Let me ask you this:  Prior

8    to the April 2011 tornado in Tuscaloosa, as

9    you sit here today, do you have any evidence

10   that GBS would not have taken care of your

11   interest?

12         A.      No.

13         Q.      Do you have any facts what Drew

14   Mayfield told you was not true, other than

15   your claim did not go as you expected?

16         A.      No.  I did not have any evidence

17   at the time, no.

18         Q.      Okay.  Now, if you called and

19   asked around about a contractor, for example,

20   you ask for references, okay?

21         A.      Right.

22         Q.      And you called up those references

23   and they did a good job on those people,

24   right?

25                 MR. GILMORE:  Hang on.  Object to

OTIS NELSON

102

1    the form.  I don't --

2          Q.      (By Ms. Clement) I want you to

3    understand my question.

4          A.      Your question --

5          Q.      My question is --

6          A.      Repeat the question.

7          Q.      -- you're looking for a contractor

8    and you call around and get references, right?

9          A.      Right.

10         Q.      And all those people tell you they

11   did a good job for them, correct?

12                 MR. GILMORE:  Are you asking a

13   hypothetical?

14                 MS. CLEMENT:  I'm asking him a

15   question.

16         Q.      Now, that doesn't mean that the

17   contractor automatically is going to do a good

18   job for you, does it?

19         A.      No, nothing is automatic.

20         Q.      People can recommend people and

21   that may have been true for them but you might

22   get a bad experience, correct?

23         A.      Right.

24         Q.      Okay.  Now, you don't disagree,

25   and you tell me if you don't agree, that the

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969

OTIS NELSON

1    based on the damage done from the April

2    tornadoes?

3                MR. GILMORE:  Object to the form.

4    He said he's not an expert.  He said it a

5    bunch of times.

6          A.    As I said again, I'm not an

7    expert on that.  I would really have no way

8    of knowing it.

9          Q.    (By Ms. Clement)  Okay.  Has

10   anyone ever told you that the estimate

11   prepared by Nationwide was not correct?

12         A.    No.  And there's probably

13   reasons why I was not told that too, but we

14   won't -- you know, but actually nobody told

15   me that, no.

16         Q.    Okay.  And as you sit here you

17   don't have any evidence that the estimate

18   prepared by Nationwide is not correct for the

19   cost to do the repairs at your home?

20         A.    No, I don't have any evidence to

21   that effect, no.

22         Q.    Does your wife have any such

23   evidence?

24         A.    You'd have to ask my wife about

25   that.